[Cite as *In re Adoption of B.R.R.*, 2024-Ohio-478.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

IN RE:

ADOPTION OF B.R.R.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 CO 0043**

---

Probate Adoption Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No.  2023 AD 00004

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. John H. Chaney, III*, Daniel Daniluk, LLC, for Appellant and

*Atty. James R. Wise*, for Appellee.

Dated:  February 8, 2024

**Robb, P.J.**

{¶1} This appeal arises from the trial court's decision granting a stepfather's petition to adopt a minor. Appellant, R.Z.B. (Father), appeals the August 16, 2023 judgment issued by the Columbiana County Court of Common Pleas, Probate Division, finding Father's consent to adopt was not required. The trial court found Father had failed without justifiable cause to have more than de minimis contact with the minor (B.R.R.) for the one year preceding the adoption petition.

{¶2} Father, however, contends his efforts to communicate and visit the child were thwarted by the child's mother, who has had sole custody and control over the child pursuant to a Pennsylvania court order. Thus, Father claims the trial court's determination that he failed to maintain contact was incorrect. Father also asserts the court's decision that his lack of contact was not justified is erroneous. For the following reasons, we affirm.

Statement of the Facts and Case

{¶3} Appellee Petitioner, R.S.R. (Stepfather), is the stepfather of B.R.R. In May of 2023, Stepfather filed a petition to adopt B.R.R., contending Father was a parent to the child and his consent to the adoption was not required. Stepfather alleged that Father was a parent who had failed, without just cause, to have more than de minimis contact with the child for one year immediately preceding the filing of the petition. Stepfather also alleged Father's consent to adopt was not required because Father failed to provide maintenance and support of the child for the one year before the filing of the petition. (May 22, 2023 Adoption Petition.)

{¶4} The child was born in 2013 and was nine years old when the petition was filed. The petition reflects that Stepfather has been married to the child's biological mother (Mother) since 2015, and they have lived together with B.R.R. and his two younger siblings.

{¶5} Mother filed her consent to the adoption. A certified copy of Mother and Father's agreed custody visitation order issued by the Beaver County Court of Common Pleas dated November 22, 2013 was also filed on the same day as the petition, May 22, 2023. It reflects that Mother and Father agreed that Mother was to have physical custody

of the child and Father had the right to supervised visitation. The agreed order indicated Father's visitation had to be supervised either by Mother or the maternal aunt. It did not contain a visitation schedule. (November 22, 2013 Order.)

{¶6} Mother also filed an affidavit with the probate court in which she avers she was owed back child support by the minor's father. She attached a copy of a Pennsylvania child support printout in support. (May 22, 2023 Mother's Affidavit.)

{¶7} The probate court scheduled the adoption petition for an August 16, 2023 hearing. Father was sent notice of the hearing at an address in New Lisbon, Wisconsin by certified mail, which was marked as delivered on May 27, 2023.

{¶8} Two assessments were conducted and filed with the court before the hearing.

{¶9} The initial adoption assessment details that Stepfather and Mother have two other children in addition to B.R.R. Mother is a stay-at-home mother and Stepfather works full time. They rent the home in which they currently live and are remodeling another home that they own nearby. Mother began living with Stepfather when B.R.R. was 1.5 years old, and at the time of this assessment, the child did not know that Stepfather is not his natural father. The caseworker who conducted the assessment recommended granting the adoption petition, stating in part: "[Petitioner] has been his father for the past 8 ½ years. He has loved him, cared for him and provided for him as his father. [Petitioner] is very committed to [the child] and will continue to provide him with a loving and stable home environment." Four letters in support of the adoption were attached to the report. Each writer was in favor of the proposed adoption and was familiar with the relationship between the child and Stepfather. (June 12, 2023 Report on Proposed Adoption.)

{¶10} The updated adoption report details the following about the child's natural father:

> [The natural father] last known to live in New Lisbon, WI. [He dated the child's mother] for about 4.5 years. [The natural father] was present at the birth * * *. They lived with [Mother's] mother and they separated as a couple in 10/2013 when [the child] was 4 months of age. [The natural father] has supervised visitation due to his drug issues. [The natural father] did initially visit but in Nov. 2014, he stopped when [the child] was 1.5 years of age.

Case No. 23 CO 0043

[The natural father] moved to Illinois to get out of Pennsylvania as he had warrants for his arrest. He went to Illinois to * * * get rehabilitation. [The natural father] did do a few facetime[* * * visits] with [the child.] [He] last physically saw [the child] in Nov. 2014 and facetime [visits] ended in Dec. 2014. There have been no phone calls, no text messages, no cards, no gifts and no extended family contact. [The natural father] does pay $100 a month [in child support] and was caught up. In Nov. 2022, [the natural father] contacted [Mother] when he got notice of this adoption. He told [Mother] he wanted to send a package to [the child] and would leave it unnamed—he has never done it. [The natural father] also wanted to call and talk with [the child] and he has never followed through. [The child] has no idea who [the natural father] is and is not aware that [Petitioner Stepfather] is not his biological father.

(June 12, 2023 Prefinalization Adoption Assessment.)

{¶11} The trial court subsequently denied Father's application for appointed counsel, finding he earns in excess of the qualifying amount. The trial court in its entry also noted that Father could request a reasonable continuance if he needed time to prepare for the hearing. (June 14, 2023 Judgment Entry.)

{¶12} On June 23, 2023, Father via counsel filed a written objection to the adoption petition. Father claimed he had been regularly paying child support. Father also asserted he employed due diligence in attempting to contact the minor but he had justifiable cause as to why contact and visitation had not occurred. (June 23, 2023 Objection.)

{¶13} Appellant also moved to continue the hearing or in the alternative to participate and testify remotely. (August 7, 2023 Motion.) The trial court denied both aspects of his motion. (August 8, 2023 Judgments.)

{¶14} The hearing on the merits commenced August 16, 2023. At the beginning of the proceeding, Stepfather withdrew his claim that Father had failed to provide de minimis support to the child during the one year prior to the filing of the adoption petition. Mother, Stepfather, and Father each testified.

Case No. 23 CO 0043

**{¶15}** Father argued his failure to maintain de minimis contact in the year before the adoption petition was filed was justified because Mother kept him from having a relationship with the child. In support, Father claimed he was only permitted to have supervised visitation per a prior court order; Mother had control over the child; the child did not know Father existed; Mother informed Father she did not want him "in and out of" the child's life; and she did not answer Father's phone calls.

**{¶16}** The evidence presented at the August 16, 2023 adoption hearing includes the following.

**{¶17}** Mother testified first. She said the child was 10 years old at the time of the hearing. She is in favor of the adoption by Stepfather, her husband, for security reasons. She said Father was present at the child's birth but that he left when the child was just more than a year old. Father was addicted to drugs and told her he was moving to Illinois to live with his brother in attempt to "get clean". He told Mother he had outstanding arrest warrants at the time. She lived with Father for about the first three months of the child's life. Mother recalled having Zoom calls with Father so he could see the child. She said it was "off and on, not many phone calls." (August 16, 2023 Tr. 6-9.)

**{¶18}** Mother said the child does not know Father. She also denied trying to prevent Father from coming to see the child. She has lived in her current home since November of 2022 and before that, she lived in her prior home for about six or seven years. She said Father knew they had purchased the home and he has always known her address. Mother also said her mother's address has not changed, which he also knew. According to Mother, Father was present for the child's first birthday, but he has not been present or sent gifts for any subsequent birthdays. She recalls Father asking about sending gifts to their son, but he never did. (August 16, 2023 Tr. 10-12.)

**{¶19}** Father did have supervised visits with the child before Father moved away. (August 16, 2023 Tr. 13.)

**{¶20}** On cross-examination, Mother testified that she just recently told the child about his natural father the month before the hearing. When Father visited him, the child was very young and did not remember. She recalls talking with Father and stating if he ever returned to the area, they could set up a time to visit. But they had no arranged

schedule or visitation agreement. Mother said that over the years, she would "get a random phone call" from Father, but nothing consistent. (August 16, 2023 Tr. 13-18.)

{¶21} Mother said Father asked to speak with the child on June 2, 2023 via a Facebook Messenger request, which was after the adoption petition was filed. She does not recall him asking before that date to contact the child. The child also very recently obtained his own phone, and Mother said she did not give the number to Father. She said Father has had her phone number.

{¶22} The prior Christmas, Father asked her what the child "was into" meaning what type of gift he would like. He did not send anything. Father asked Mother to "give him an opportunity to be a father" to the child, but this request was after the adoption petition was filed. (August 16, 2023 Tr. 19-24.)

{¶23} When asked about her not telling the child about his natural father, Mother said: "No, he could have been involved all along. I don't know why it was my fault that he did not know who [his natural father] was." She said neither of them set up Father's visitation with the child. When asked about phone calls, Mother stated: "When we stopped the video calls it was because [Father] was getting high in the video and nodding off." The child was three years old, and Mother said "he has not called since then." (August 16, 2023 Tr. 26-27.)

{¶24} Mother agrees that she told Father via Facebook that she did not want him in the child's life unless there was consistency, stating "[b]ecause of drug use I said I don't want him in and out of his life. * * * That was years ago." (August 16, 2023 Tr. 28.)

{¶25} On redirect, Mother agreed Father did not tell her he was coming to the area and wanted to visit their child. He told her he had been sober for three years, but she did not know that for sure. She denies preventing Father from seeing the child. She said Father has known "for years" that Stepfather wanted to adopt him. Mother said Father has always been allowed to come and see the child and has always been allowed to visit. But stated "why was it my job to make him be a father and present in [the child's] life." (August 16, 2023 Tr. 30.)

{¶26} Stepfather testified that he is 52 years old. He started dating Mother when the child was an infant. Stepfather first met the child when he was fourteen months old.

They have been in one another's lives since then. Stepfather and Mother have two other children together.

**{¶27}** Stepfather denies ever telling Father to stay away from the child. Instead, Stepfather explained that they gave Father time to "get his stuff together and come back into [the child's] life and then after three, four years we realized that probably wasn't going to happen and that is when, one of the reasons that we wanted to go forward with the adoption." (August 16, 2023 Tr. 35-37.)

**{¶28}** Father testified on his own behalf. He has lived in Wisconsin at the same address for about four years. It took him eleven hours to drive to Ohio for the hearing. He has had the same job for about four years as well. During that time, he has not failed a drug test, which are randomly given by his employer. Father acknowledged that he is in recovery and because of his drug addiction, he "got into trouble" in several different states. He denies using drugs for about four years. (August 16, 2023 Tr. 41-43.) Father has since resolved all of his criminal matters and there are no warrants for his arrest.

**{¶29}** During the child's life, Father said he would call Mother infrequently to check on the child's wellbeing and let her know he cared about their child. She tended not to answer her phone, but he would leave messages for her.

**{¶30}** During the one-year period before the adoption petition, Father claims he called Mother multiple times. He does not think he spoke with her once, though, because he said "she never answered." Their primary method of communicating was via Facebook Messenger. (August 16, 2023 Tr. 44-47.) According to Father, they communicated this way since 2019.

**{¶31}** According to Father, because the child did not know he even existed, it essentially dictated his behavior toward the child. Father said because the child did not know him, he could not even send him a gift. He said: "How am [I] going to send stuff or try and talk to somebody that has no idea that I even exist let alone I am his father." (August 16, 2023 Tr. 49.) Father blamed Mother's stated desire that she did not want him coming in and out of the child's life as preventing him from having a relationship with the child.

**{¶32}** Father introduced numerous Facebook Messenger communications between him and Mother. He states he wants to be a part of the child's life in the

messages, but there is nothing in the record showing any corresponding action or efforts to see B.R.R.

**{¶33}** Father agreed on cross-examination that he had not been a good father, but said he wants to be a good father now. He also agreed that he did not send birthday or Christmas cards and gifts, but he could have. (August 16, 2023 Tr. 58-59.) Father thought Mother would have thrown away anything he sent, so it would have been futile.

**{¶34}** At the conclusion of the hearing, the trial court determined Father's consent to adopt was not required because he "failed without justifiable cause to provide more than de minimis contact with the minor for a period of at least one year immediately preceding the filing of the adoption petition * * *." (August 16, 2023 Judgment.)

**{¶35}** The trial court explained its decision at the conclusion of the hearing, stating in part: "I understand that you have been through a lot in your life but the evidence I have before me shows that you have strong feelings but you had not acted on those feelings even though you have been sober evidently * * * [for] four years * * *." (August 16, 2023 Tr. 62.) The court noted that Father was contacting the mother and asking for updates on the child but never really asked to see the child. (August 16, 2023 Tr. 63.)

**{¶36}** Appellant raises two assignments of error on appeal.

Assignments of Error

**{¶37}** Appellant's First Assignment of Error asserts:

"Whether the trial court erred, and abused its discretion, in finding that Appellant failed without justifiable cause to provide more than de minimis contact with the minor child for a period of at least 1 year immediately preceding the filing of the Petition for Adoption of a Minor, where the facts establish that Appellant exercised due diligence to contact and communicate with the minor child through the Biological Mother, as required by the applicable Court order."

**{¶38}** Appellant's Second Assignment of Error asserts:

"Whether the trial court erred, and abused its discretion, in finding that Appellant failed without justifiable cause to provide more than de minimis contact with the minor child for a period of at least 1 year immediately preceding the filing of the Petition for Adoption of a Minor, where the facts establish that Biological Mother interfered with Appellant's attempts at contact and communication with the minor child."

Case No. 23 CO 0043

{¶39} We address his assigned errors together since they are closely related.

{¶40} In his first assignment, Father claims he did not fail to maintain more than de minimis contact with the child for the one-year period. Instead, Father asserts he continually contacted the child's mother, which was all he was permitted to do under the parties' agreed visitation order. And because his contact was limited per court order, the trial court abused its discretion finding he did not maintain contact.

{¶41} Father's second assigned error also relies on the prior court order. He contends that if we agree with the court's decision that he failed to have more than de minimis contact with the child for the one-year before Stepfather's adoption petition was filed, the court erred in its determination that Father's failure in this regard was not justified. Father claims he should not be punished for his reliance on and compliance with the prior court order, which he claims was essentially a no-contact order with the child.

{¶42} For the following reasons, we disagree with both assignments and affirm the trial court's decision.

{¶43} Written consent is generally required of parents before an adoption may proceed because adoption terminates the fundamental rights of natural parents. R.C. 3107.06. Exceptions to this rule are in R.C. 3107.07, which states:

> Consent to adoption is _not_ required of any of the following:
>
> (A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds *by clear and convincing evidence* that *the parent has failed without justifiable cause to provide more than de minimis contact with the minor* * * * for a period of at least one year immediately preceding * * * the filing of the adoption petition * * *.

(Emphasis added.) R.C. 3107.07.

{¶44} The party seeking to adopt bears the burden to prove by clear and convincing evidence two prongs under R.C. 3107.07. Applicable here, Stepfather had to prove Father failed to have more than de minimis contact with the child for the requisite one-year period. Second, the petitioner must have shown Father's lack of de minimis contact was without justifiable cause. *Id.*

Case No. 23 CO 0043

**{¶45}** Clear and convincing evidence is evidence that is sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶46}** Whether the natural parent failed to have more than de minimis contact with the child for the requisite one-year period is a question of fact to be decided on a case-by-case basis. *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 21. Appellate courts review a trial court's decision in this regard for an abuse of discretion, meaning we must affirm unless the decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶47}** However, "whether justifiable cause for the failure to [have more than de minimis contact] has been proved by clear and convincing evidence is a separate question for the probate court and will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 3.

> The probate court as the trier of fact determines the weight and credibility of the evidence. *Seasons Coal Company, Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). On review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Adoption of M.T.R.*, 5th Dist. Licking No. 2022 CA 00010, 2022-Ohio-2473, ¶ 24.

**{¶48}** Father claims the facts here are akin to those in *In re Adoption of B.I.*, 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28. In *In re Adoption of B.I.*, the Supreme Court found the father's nonpayment of support did not trigger the exception in R.C. 3107.07 because he was acting consistent with a court order by which father had no financial obligation to pay.

**{¶49}** Father also heavily relies on *In re Adoption of A.K.*, 168 Ohio St.3d 225, 2022-Ohio-350, 198 N.E.3d 47, in which the Supreme Court concluded in a divided opinion that the natural father's consent to adopt *was* required. The issue before the court

Case No. 23 CO 0043

was whether the existence of a no contact order directing the natural father to have no contact with the child, and father's compliance with the order, constitute "justifiable cause" for father's failure to have more than de minimis contact with the child for the one-year period. *Id.* The majority of justices agreed that father's compliance with that order constituted "justifiable cause." The order stated: "Father shall have no contact with the minor children absent an Order from this Court." *Id.* at ¶ 2.

{¶50} Father claims the supervised visitation plus Mother's unwillingness to cooperate were tantamount to a no-contact order, as was the case in *In re Adoption of A.K.* We disagree.

{¶51} Both *In re Adoption of B.I.* and *In re Adoption of A.K.* involved fathers who complied with court orders either directing them not to pay child support or to have no contact with the child. Unlike those cases, the applicable court order here did not state Father was to have no contact with the child or was not to pay support. Instead, the order granted Father the right to supervised visitation.

{¶52} As for Father's first assigned error, it lacks merit. Father's conduct of contacting Mother is not synonymous with contacting the child. There is nothing in evidence showing Father attempted to visit the child during the applicable one year. Father did not return to Ohio, and he did not provide a date certain he would be at the child's home. He likewise did not go to the child's home. Father likewise did not send cards or gifts. Thus, the trial court did not abuse its discretion in finding that Father failed to have more than de minimis contact with the child during the one year prior to Stepfather's adoption petition.

{¶53} As for Father's second assignment, we conclude the trial court's finding of a lack of justifiable cause is not against the manifest weight of the evidence.

{¶54} "Justifiable cause" is not defined in R.C. 3107.07. However, the Supreme Court has stated that "significant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367-368, 481 N.E.2d 613 (1985).

**{¶55}** While Father said he wanted to visit the child and he told Mother he wanted to send the child gifts, Father's actions do not correspond with his stated intentions. Father claims Mother knew he would not return to Ohio to visit the child unless she agreed in advance. This is because Father lived a great distance away. Yet, Father did not testify that he ever informed Mother he would, for example, be in the state during a certain period of time. He did not attempt to schedule a visit.

**{¶56}** Further, Father's visitation rights were dictated by the parents' custody and visitation agreement, which was adopted by the Beaver County Court of Common Pleas. The order states "Physical custody of the minor child is awarded to the mother, with visitation rights vested in the father as agreed upon by the parties * * *." It also states the order was "enforceable by the Court through Contempt proceedings and/or the Child Custody Officer." Courts generally have continuing jurisdiction to modify parenting time or visitation orders. *See In re Adoption of B.I.*, 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28, ¶ 28.

**{¶57}** Further, in *In re Adoption of M.G.B.E.*, 154 Ohio St.3d 17, 2018-Ohio-1787, 110 N.E.3d 1236, the Ohio Supreme Court found the father's pending motion to re-establish parenting time with his children was relevant and should have been considered in determining whether Father's consent to their adoption was required. *Id.* at ¶ 43. In that case, the mother's efforts to impede father's visitation included:

> repeatedly failing to deliver the children to Father at a court-ordered time and place, moving multiple times without informing Father or the domestic-relations court of her new address, changing her telephone number without informing Father or the domestic-relations court, changing the children's last names without Father's knowledge, and calling the police when Father appeared at [their child's] track meet.

*Id.* at ¶ 45.

**{¶58}** Here, however, there is nothing showing Father filed a motion with the applicable court or Child Custody Officer to secure visitation or remote parenting time.

**{¶59}** Although Father made general statements about being the child's father and his desire to visit, there is nothing showing Father informed Mother he would be in Ohio on a certain date and he was going to exercise his right to supervised visitation. Father

continued to contact Mother and inquire about the child's wellbeing, but he did not take affirmative steps to see the child. Father likewise did not send the child gifts or cards.

{¶60} There is also nothing showing Mother or Stepfather interfered with Father's attempted visits or thwarted his efforts by destroying cards or gifts sent to the child. To the contrary, Father testified that he believed his efforts in this regard *would have been* interfered with, and as such, he chose not to send gifts or cards. We acknowledge the fact that the child did not know about his natural father or that Appellant was his father likely deterred Father from sending gifts and cards. Yet we do not know what Mother would have done upon receipt of gifts and cards from Father because he never sent them.

{¶61} Although Mother and Stepfather did not seem to be desirous of having Father communicate or visit with the child, there is nothing showing they interfered with Father's efforts to establish contact. Father admittedly had a severe drug problem and several warrants for his arrest when he moved away. Moreover, Mother testified about Father's early Facetime visits with the child, which stopped because Father was using drugs during the video conference with the child.

{¶62} Aside from Father's statements to Mother that he wanted to send gifts and he desired to visit and be a part of the child's life, Father made no corresponding effort to exercise his legal right to visitation and did not send the child gifts or cards. Father knew their address and telephone number, yet he did not appear and insist on visiting.

{¶63} Further, the evidence shows Mother had good reason for asking Father not to "come and go" from the child's life. Her statements in this regard tend to show she was seeking consistent involvement by Father, not a lack of involvement. The evidence does not show significant discouragement such that we can conclude Father had "justifiable cause" for failing to have contact with the child during the one-year period.

{¶64} After reviewing the record and considering the totality of the circumstances, the record supports the trial court's decision that Father did not have justifiable cause. The trial court did not clearly lose its way or create a manifest miscarriage of justice. Because this is not one of those exceptional cases in which the evidence weighs heavily against the probate court's decision, we find no error.

{¶65} Accordingly, both assigned errors lack merit.

Case No. 23 CO 0043

<u>Conclusion</u>

**{¶66}** Based on the foregoing, we agree with the trial court's determination that Stepfather met his burden of proof and satisfied both aspects of R.C. 3107.07.  Thus, we overrule Father's assignments of error and affirm the trial court's decison.

Waite, J., concurs.

Hanni, J., dissent with dissenting opinion.

<u>Case No. 23 CO 0043</u>

Hanni, J., dissent with dissenting opinion.

**{¶67}** With regard and respect to my colleagues, I must dissent from the majority opinion. "[T]he right of a natural parent to the care and custody of his children is one of the most precious and fundamental in law." *In re Adoption of Masa*, 23 Ohio St.3d 163, 164, 492 N.E.2d 140 (1986). Since adoption ends this fundamental right of a natural parent, the Ohio Supreme Court has held that ""* * * any exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of natural parents to raise and nurture their children.'" *In re A.L.H.*, 9th Dist. Medina Nos. 18CA0084-M, 18CA005-M, 2020-Ohio-3527, ¶ 8, quoting *Masa, supra,* at 164; *see also In re Adoption of P.L.H.*, 151 Ohio St.3d 554, 2017-Ohio-5824, ¶ 23.

**{¶68}** With this in mind, I would find merit to Father's first assignments of error. R.C. 3107.07 provides that a parent's consent is not required when:

> A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

**{¶69}** At the hearing, counsel for Stepfather agreed that he was not proceeding on his claim that Father failed to provide for the maintenance and support of the child. (Tr. at 3-4). Counsel represented that Father was current in his maintenance and support order for the child. (Tr. at 4).

**{¶70}** Thus, Stepfather was required to prove by clear and convincing evidence that Father failed to have more than de minimis contact with the child for the one year preceding the filing of the adoption petition and Father's lack of de minimis contact was without justifiable cause. We review the court's decision on de minimis contact for an abuse of discretion, and we review whether justifiable cause exists for the failure to have more than de minimis contact under a manifest weight of the evidence standard. *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 3.

Case No. 23 CO 0043

**{¶71}** While Mother testified that Father could have been involved with the child all along, she admitted that she did not tell the child that Father was his biological father until one month before the hearing in this case. She also admitted that when the child was younger and Father contacted her through Facebook, she told him that she did not want him in and out of the child's life. Father had been addicted to drugs, but left the area to get sober.

**{¶72}** Father has been in recovery for the last four years and has gotten his life together. (Tr. at 40-44). He has lived and worked in Wisconsin for the last four years. (Tr. at 40-41).

**{¶73}** Mother acknowledged that during the relevant one-year period, she and Father communicated back and forth. (Tr. at 20). She noted that they communicated in November of 2022 and when she told Father that they wanted to proceed with adoption, Father asked if he could have a relationship with the child. (Tr. at 21-22). She also testified that they had random conversations in January and February of 2023 before the petition was filed. (Tr. at 23). Father also introduced Facebook Messenger communications between him and Mother which began in 2019. (Tr. at 47).

**{¶74}** The majority holds that, "Father's conduct of contacting Mother is not synonymous with contacting the child." While this is technically correct, Father had to communicate with Mother in order to have contact with the child due to the supervised visitation order, and the fact that the child was 10 years old and had only very recently obtained a cell phone. (Tr. at 19, 24-26). Since the child did not have his own means of communication with Father until recently, Father had to contact Mother. He testified that he attempted to contact Mother multiple times, but she did not answer her phone, so he left messages. (Tr. at 45, 46). He also indicated that because Mother had not told the child that he was his father, it was awkward to send gifts for Christmas which would be as if they were from a stranger.

**{¶75}** Parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes,* 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Whether involved in juvenile court custody proceedings "or adoption proceedings in probate court, parents who contest the involuntary and permanent termination of their parental rights fight the same battle

Case No. 23 CO 0043

against 'the family law equivalent of the death penalty.'" *In re Y.E.F.*, 163 Ohio St.3d 521, 2020-Ohio-6785, 171 N.E.3d 302, ¶ 19, quoting *Hayes*, *supra,* at, 48, quoting *Smith*, *supra,* at 16, 601 N.E.2d 45 (6th Dist.1991).

{¶76} Accordingly, based on the record, I would find that the court abused its discretion by finding that Stepfather demonstrated that Father failed to provide more than de minimis contact with the minor during the one-year period preceding the filing of the adoption petition. I would sustain Father's first assignment of error.

[Cite as *In re Adoption of B.R.R.*, 2024-Ohio-478.]

—————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Probate Division of Columbiana County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**