[Cite as *In re A.J.W.*, 2024-Ohio-3124.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN THE MATTER OF: A.J.W.

:
:
:     C.A. No. 30042
:
:     Trial Court Case No. 2020 ADP 00147
:
:     (Appeal from Common Pleas Court-
:     Probate Division)
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on August 16, 2024

. . . . . . . . . . .

ANTHONY C. SATARIANO, Attorney for Appellant

JULIA C. KOLBER, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Appellant Father appeals from a judgment of the Montgomery County Court of Common Pleas, Probate Division, which found that Father's consent was not required

for the maternal grandparents to adopt A.J.W.[1]   For the reasons that follow, we will affirm the judgment of the trial court.

## I.    Facts and Course of Proceedings

**{¶ 2}** A.J.W. was born in August 2018, and Father was listed on his birth certificate. On November 24, 2019, A.J.W.'s mother died.   On March 4, 2020, the Montgomery County juvenile court granted legal custody of A.J.W. to his maternal grandparents, Grandmother and Grandfather, effective March 4, 2020 (Case No. G-2019-005712-01).

**{¶ 3}** On December 11, 2020, Grandmother and Grandfather filed a petition in the probate court to adopt A.J.W.   The petition identified Father as a person whose consent to the adoption was not required, because he had failed without justifiable cause to provide more than de minimis contact with the child and had failed without justifiable cause to provide maintenance and support for the child for a period of at least one year immediately preceding the filing of the adoption petition.   The petition also stated that A.J.W.'s mother was deceased and that the address of Father was unknown.

**{¶ 4}** Grandparents filed an affidavit with the probate court relating to their search for Father; it stated that they had been unable to provide personal service on Father because they had not been able to find his address with reasonable diligence.   Based on Grandparents' filing, the probate court ordered that notice be given to Father by publication prior to a hearing scheduled for April 2, 2021, at which the petition for adoption would be considered.

---

[1] In keeping with this court's policy involving minors, we will refer to the child only by initials, A.J.W., to the petitioners seeking to adopt the child as Grandmother and Grandfather or, collectively, Grandparents, and to A.J.W.'s biological father as Father.

{¶ 5} Following the hearing on April 2, 2021, the probate court found that Father's consent was not required pursuant to R.C. 3107.07, because Father had failed without justifiable cause to provide (1) more than de minimis contact with the minor for a period of at least one year immediately preceding the filing of the adoption petition; and (2) for the maintenance and support of the minor for a period of at least one year immediately preceding the filing of the adoption petition.   On that same day, a magistrate's decision and final decree of adoption was issued, granting the petition for adoption.   No timely objections were filed, and the magistrate's decision was adopted as an order of the probate court.

{¶ 6} Over a year later, on May 3, 2022, Father filed a handwritten statement in the probate court, stating in part: "Since my sons mothers death (11-24-2019) the maternal grandparents have not allowed me to have any communication with [A.J.W.].   So I filed for custody.   I object the adoption, I DID NOT consent for my son to be adopted, I WAS NOT notified by anyone that my son was going to be adopted.   I again OBJECT the adoption of [A.J.W.]."   (Emphasis in original.)   Father signed his name and provided a telephone number and an address in Dayton, Ohio.

{¶ 7} On June 15, 2022, Father filed a motion to vacate judgment or for relief from judgment through counsel. Father claimed that he had never received notice of the adoption proceedings and that the maternal grandparents had not exercised reasonable diligence in trying to locate him.   Further, Father contended that the judgment of adoption was void due to lack of notice and that he was entitled to relief from judgment pursuant to Civ.R. 60(B)(1), (3), and (5).

{¶ 8} The probate court denied Father's motion to vacate or for relief from the judgment of adoption. and Father filed a timely notice of appeal. On appeal, we concluded that the probate court had erred in overruling Father's motion. *In re Adoption of A.J.W.*, 2023-Ohio-2609, ¶ 29 (2d Dist.). We determined that Father had not received proper notice of the adoption hearing and an opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* at ¶ 28. Accordingly, on July 28, 2023, we reversed the judgment of the trial court and remanded the cause for further proceedings.

{¶ 9} On remand, Father attempted to disqualify the probate court judge by filing an affidavit of disqualification with the Supreme Court of Ohio. On August 30, 2023, the Supreme Court denied Father's affidavit of disqualification, and the case proceeded in the probate court.

{¶ 10} On September 25, 2023, Father was assigned appointed counsel. However, on October 16, 2023, Father filed a motion titled "Notice of Termination of Counsel Request for Reassignment of Counsel." A hearing on Father's motion was held on October 30, 2023. Before the hearing began, Father was served with a copy of the December 11, 2020 petition for adoption, and a hearing on the petition was scheduled for December 19, 2023. At the hearing on October 30, 2023, Father acknowledged receipt of the petition and notice of the December 19, 2023 hearing. The probate court set December 5, 2023, as a closing date for any discovery. Following the hearing, the probate court denied Father's request for new appointed counsel and stated that Father could either proceed pro se or personally hire an attorney to represent him.

{¶ 11} On October 31, 2023, Father filed a motion to dismiss the petition due to

the trial court's lack of subject matter jurisdiction. The probate court denied Father's motion the following day.

{¶ 12} On November 1, 2023, Grandparents filed a request for interrogatories, production of documents, and admissions of Father. The requests were sent to Father via email and regular U.S. mail.

{¶ 13} On November 8, 2023, Father filed a notice requesting that the probate court judge recuse himself due to a "civil lawsuit" that Father had filed against the judge. The "civil lawsuit" filed was a petition for a writ of habeas corpus filed with this court. The probate court stayed the adoption proceedings until the proceedings in this court concluded. However, the court's entry also stated that the probate court would reserve the December 19, 2023 hearing date on the petition for adoption in the event the appellate court case was concluded prior to that date.

{¶ 14} On November 14, 2023, we denied Father's writ and dismissed the action. *In re Adoption of A.J.W. v. Brannon*, 2d Dist. Montgomery No. 29966 (Decision and Final Judgment Entry, Nov. 14, 2023). On November 15, 2023, the probate court vacated the stay and advised the parties that the hearing on the petition for adoption would proceed as originally scheduled on December 19, 2023. The order also stated that all other deadlines remained.

{¶ 15} On November 17, 2023, Father filed a second petition for writ of habeas corpus in this court. On November 21, 2023, we denied denying Father's writ and dismissed the action. *In re Adoption of A.J.W. v. Brannon*, 2d Dist. Montgomery No. 29970 (Decision and Final Judgment Entry, Nov. 21, 2023).

{¶ 16} On December 5, 2023, Grandparents filed a motion requesting that the court issue an order that deemed the four admissions served on Father to be admitted. The request included the following admissions:

1. Admit or Deny that you did not have any contact with the minor child, [A.J.W.] from December 11, 2019 to December 11, 2020.

2. Admit or Deny that you have failed to provide any financial support for [A.J.W.] from December 11, 2019 to December 11, 2020.

3. Admit or Deny that it is in the minor child's best interest for his Maternal Grandparents to adopt the minor child.

4. Admit or Deny that you made no attempt to contact the minor child from December 11, 2019 to December 11, 2020.

The motion was granted on December 7, 2023.

{¶ 17} A hearing was held on December 19, 2023, solely to determine whether Father's consent was required for the adoption. Grandparents and their counsel and Father and his retained counsel were present. Before the hearing began, Father's counsel entered his appearance and orally requested a continuance of the hearing; Father's counsel indicated that he had just been hired two hours prior to the hearing and that he was not prepared to go forward. Grandparents opposed the continuance, and the probate court denied Father's request for a continuance.

{¶ 18} Grandmother testified that she and Grandfather were married and lived together in Dayton. A.J.W. was born in August 2018 to Grandparents' daughter. Father was A.J.W.'s legal father. On November 24, 2019, A.J.W.'s mother died, and he went

to live with Grandparents. Following their daughter's death, Grandparents became legal custodians of A.J.W. through a Montgomery County Juvenile Court Order issued on March 4, 2020. They filed a petition to adopt A.J.W. on December 11, 2020.

{¶ 19} Grandmother testified that there was no landline phone at their house, but she and her husband had separate cell phones. Grandmother had had the same phone number for about 15 years, and she and Grandfather had lived in the same home since 2017. She denied that Father had attempted to contact her to see A.J.W. between December 11, 2019, and December 11, 2020. She further testified that Father had not sent A.J.W. any mail, had any contact, or provided any support during the relevant time frame. To the best of her knowledge, Grandmother was not aware of any contact whatsoever between Father and A.J.W. during the relevant time frame. Grandmother was aware that Father had been incarcerated for a portion of the relevant time frame, but she did not receive any mail or phone calls from a jail or prison in Ohio.

{¶ 20} Grandfather testified that he and his wife took custody of A.J.W. right after their daughter died in November 2019. A.J.W. had lived with them in their home since that time.

{¶ 21} Grandfather stated that he had a cell phone separate from his wife, which he had had for 14-15 years. He testified that Father had not contacted him at all on his phone between December 11, 2019, and December 11, 2020, and denied ever receiving a call from a jail or prison during that time frame. On cross-examination, Grandfather admitted that he had not brought any phone records with him to the hearing. Grandfather further admitted that he had a Facebook page and could receive calls via Facebook.

However, he denied ever receiving a call from Father via Facebook. According to Grandfather, at no time during the relevant time period did Father ever ask to have any contact with A.J.W.

{¶ 22} Grandfather did not know of any instance in which Father had seen A.J.W. or had had any communications with A.J.W., either through the mail or via telephone, between December 11, 2019, and December 11, 2020. He never had received cards or gifts for A.J.W. from Father, and he never received any money from Father to support A.J.W. during the relevant time frame. Grandfather stated that he and his wife never sought child support or any other kind of assistance from Father for A.J.W.'s benefit.

{¶ 23} Grandfather denied threatening to call the police on Father for harassment or to file charges against Father during the applicable time frame. Grandfather stated that he had been aware of Father's incarceration at some point, but he did not know when Father had been in or out of custody.

{¶ 24} Father testified on his own behalf. He claimed to have reached out to the Grandparents "multiple times" while he was incarcerated. This included trying to call them through Facebook, but he was denied contact; he alleged that Grandparents had blocked him. Father also stated that he had called both Grandparents while he was incarcerated. Father testified he had been in the Montgomery County Jail from December 19, 2019, until around December 23, 2019. He was then transferred to the Shelby County Jail, where he remained until approximately February 23, 2020. Then he was transferred to the Clermont County Jail, where he remained incarcerated until March 24, 2020, when he was released. On June 1, 2020, Father was incarcerated again at

the Montgomery County Jail and ultimately sentenced to prison. Father was released from the Madison Correctional Institution on July 24, 2021.

{¶ 25} According to Father, he called Grandmother while he was in the Shelby County Jail. She answered the phone and Father asked to speak with A.J.W., but Grandmother immediately hung up. When he called back, the phone went to voicemail. Father tried to call Grandmother a second time while he was in Madison Correctional Facility. On that occasion, after Grandmother answered, she hung up on him. Father testified that he also tried to call Grandfather one time while he was in the Montgomery County Jail in January 2020. According to Father, Grandfather answered the phone and told him to stop calling. When confronted with his own testimony that he had not been in the Montgomery County Jail in January 2020, Father admitted that he did not remember the date he called Grandfather but was certain he had called Grandfather at some point.

{¶ 26} Father testified that, in mid-April 2020, his cousin texted him and stated that she was visiting at Grandparents' house. Father then called his cousin by video chat. The entirety of the call lasted approximately 16 minutes. During that call, he spoke to A.J.W. by video chat for 4-5 minutes.

{¶ 27} Father stated that he never mailed A.J.W. anything because he did not know the mailing address of Grandparents' house. He also never stopped over there during the period when he was not incarcerated because he was not allowed around their home. Father claimed that, at some time prior to December 11, 2019, Grandfather had threatened him with his guns and threatened that he would call the police on Father if he came over. Therefore, Father never tried to go over to Grandparents' house because

he was "scared for [his] life."

**{¶ 28}** Father acknowledged that he had never sent any money or gifts to support his son.   However, Father also testified that he had not been aware of any court order requiring him to provide child support or financial assistance for his son.   Father stated that while he was incarcerated, he earned $21 per month, but it was garnished to pay his restitution.   When he was not incarcerated, he applied for jobs but never got hired and, therefore, had no income.

**{¶ 29}** On cross-examination, Father admitted that he had received a request for any exhibits or documentation he might have had, but he did not send counsel anything because he did not understand it and he was looking for an attorney.   Father conceded that he never went to a court to seek visitation of A.J.W. during the relevant one-year time period, never tried to send anything through the mail to A.J.W., and there was no restraining order in place to prevent him from seeing A.J.W. or Grandparents.

**{¶ 30}** Father claimed that he had filed a motion for custody of A.J.W. in the juvenile court in December 2019.   However, it was later shown that he had not filed a motion for a change of custody or to get parenting time until March 7, 2022.   Father also claimed that he had filed something in the juvenile court during the applicable time frame, but when questioned, he stated that he had gone with his own father (A.J.W.'s paternal grandfather), and paternal grandfather had filed in his own name for custody.   The docket did not reflect that paternal grandfather had filed any motion for custody during the applicable time frame.

**{¶ 31}** Following Father's testimony, he renewed his request for a continuance,

claiming there was a "potential" of having additional evidence brought forward. Father asked to continue the hearing for "a very short time period." Grandparents again objected to any continuance, and the trial court denied the request.

{¶ 32} On rebuttal, Grandfather testified that he had never threatened Father, would never threaten Father, and did not own a gun. Grandfather advised that, if Father had called him and asked to see his son, Grandfather would have allowed Father to see A.J.W. so long as it was supervised and safe. Grandfather stated that during the relevant time frame, Grandfather never told Father he could not see his son. Grandfather denied that Father had ever called him or that he had answered a call and hung up on Father.

{¶ 33} The trial court issued a decision on January 4, 2024, finding that Father's consent was not required pursuant to R.C. 3107.07(A). The court found by clear and convincing evidence that Father had failed to have more than de minimis contact with A.J.W. between December 11, 2019, and December 11, 2020, and that his failure to do so was without justifiable cause. The trial court further found that Father had failed to provide for the maintenance and support of A.J.W. during the applicable time frame without justifiable cause.

{¶ 34} Father timely appeals, raising five assignments of error.

## II. First Assignment of Error

{¶ 35} In his first assignment of error, Father argues that the trial court abused its discretion in denying his request for a continuance of the hearing. Father claims the continuance should have been granted because 1) the requested continuance was only for a short time; 2) no prior continuances had been requested; 3) there would have been

no inconvenience to the parties or the court; 4) the reason for the continuance was legitimate; and 5) his constitutional right to parent his child was at stake.

{¶ 36} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). "An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion. (Citations omitted.) *Id.* The term "abuse of discretion" has been defined as "conduct that is unreasonable, arbitrary or unconscionable." *State v. Beasley*, 2018-Ohio-16, ¶ 12, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 37} "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Citations omitted.) *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) Factors to consider in deciding whether to grant a continuance include:

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Unger* at 67-68. However, the Supreme Court of Ohio has stressed that "*Unger* does not suggest that information will always be available about each of these factors or require

a court to assign particular weight to any one factor." *Musto v. Lorain Cty. Bd. of Revision*, 2016-Ohio-8058, ¶ 23.

**{¶ 38}** Considering all the circumstances surrounding Father's request, we conclude the trial court did not abuse its discretion in denying Father's oral motion for a continuance on the day of the hearing. The basis for Father's request to continue the hearing was that his counsel, whom Father had just hired, was unprepared. Father did not file a motion to continue the hearing in advance of the hearing date or indicate to the court in any way that he was not prepared to proceed prior to the day of the hearing. Montgomery County Probate Court Loc.R. 56.1(A) provides that "a party's motion for a continuance shall not be granted without notice to, or the consent of, any adverse party or the adverse party's attorney and the Court." If consent of the opposing party has not been obtained, then a party may file a written motion for a continuance with the court. Probate Loc.R. 56.1(D). However, a "motion for continuance must be submitted or filed at least seven (7) days prior to the scheduled hearing or trial date." Probate Loc.R. 56.1(E). A party's failure to request a continuance in accordance with the rules "may result in the denial of a request for a continuance absent extraordinary circumstances." Probate Loc.R. 56.1(F). Father did not comply with the local rules or show extraordinary circumstances to justify his untimely request. Further, Father provided no reason why he could not have obtained counsel prior to the day of the hearing or notified the court in advance of the hearing that he needed additional time to obtain counsel.

**{¶ 39}** When Father's counsel orally requested a continuance at the beginning of the hearing, no length of time needed was specified. Father's counsel explained that he

had been hired by Father only two hours prior to the hearing. He indicated that he understood that the hearing was "a simple matter" but stated that he had not had enough time to properly prepare.

{¶ 40} Grandparents objected to the continuance, and the probate court denied it. The court explained that the case had been initiated on December 11, 2020, and had been on appeal multiple times, and the date for the hearing deciding the need for Father's consent had been scheduled long in advance. The court also indicated that the only issue to address at the hearing was whether Father's consent was needed for the adoption, and it affirmed that the burden was on the Grandparents to satisfy the statutory requirements.

{¶ 41} The probate court further explained that Father had been appointed counsel but had terminated that attorney relationship. Father had had plenty of time to retain new counsel prior to the hearing date, which had been scheduled since October 30, 2023. According to the probate court, it had repeatedly advised the parties that the case was going to proceed on December 19, 2023, and that the case needed to be concluded.

{¶ 42} After Father testified at the hearing, his counsel renewed the request for a continuance and stated he would only need a "very short time period." Counsel explained that "it's been brought out that [Father] does have potential [sic] having some additional information we'd like to bring forward." Tr. 75. Counsel reiterated that he had just been retained and had had inadequate time to prepare. Grandparents again objected to the continuance, and the trial court again denied the request for a continuance.

{¶ 43} Father did not identify what evidence he would have introduced had he been granted a continuance. Nevertheless, the probate court had set forth a discovery deadline on October 30, 2023, identifying the cutoff date for discovery as December 5, 2023. Grandparents filed a request on November 1, 2023, for disclosure of any evidence or witnesses Father intended to introduce at the hearing. Father did not respond to their request. Father had ample opportunity to obtain the documentation he needed to support his testimony prior to the court's discovery deadline and to provide notice to opposing counsel of his intent to use any evidence. We see no abuse of discretion in denying Father's request for a continuance based on Father's assumption that he might be able to obtain additional evidence to support his testimony.

{¶ 44} The adoption petition had been pending since December 11, 2020, when A.J.W. was one year old. By the time of the hearing on December 19, 2023, A.J.W. was four years old and had been living with Grandparents since his mother died. As the probate court noted, following the remand from this court in July 2023, Father filed motions with the Ohio Supreme Court, this court, and the probate court, that delayed the case from proceeding. Although this may have been Father's first request for a continuance of the hearing, the case had been pending a long time with delays occasioned by Father, and any continuance would have further delayed the determination of the case. Moreover, it is clear from the record that Father caused the stated reasons for the delay.

{¶ 45} Father argues there would have been no inconvenience to the court or Grandparents if the continuance had been granted, because Grandparents were the only

witnesses to testify. Yet the probate court could have reasonably determined that there would have been some inconvenience to the parties, counsel, and the court, considering that they would have had to modify their schedules to accommodate a new hearing date. Grandparents and their counsel were prepared and ready to proceed after waiting several years since the initial filing of the adoption petition. The court could have reasonably determined that the inconvenience of a continuance was not justified by Father's failure to obtain counsel at an earlier time. *In re Weisenberger*, 1999 WL 236073, *2 (2d Dist. Apr. 23, 1999). Moreover, this was not the only factor for the court to consider.

{¶ 46} Finally, Father contends that because a constitutional right was involved regarding his parenting, this factor should have weighed heavily in favor of granting the continuance. But Father had notice and an opportunity to be heard regarding his consent to the adoption. He also had counsel on the day of the hearing to represent his interests, who cross-examined Grandparents and put forth evidence in support of Father's position via Father's testimony. Although counsel would have liked to be more prepared, Father's untimely hiring of counsel caused counsel to be unprepared and request the continuance. The single issue before the court, which counsel for Father admitted was "a simple matter," was whether Grandparents could establish that Father had failed to have more than de minimis contact with A.J.W. or to provide financial support for A.J.W., without justifiable cause, during the one year preceding the filing of the petition. Given that Grandparents' request for admissions had been deemed admitted and Father's admission in his own testimony that he had provided no financial support for A.J.W. at all and had had only one 4-5 minute video call with A.J.W. and three attempts to call

Grandparents during the year preceding the filing of the petition, we cannot conclude that the outcome of the hearing would have been different had Father been granted a continuance. Considering all the circumstances in this case, the trial court did not abuse its discretion in denying Father's oral request for a continuance on the day of the hearing.

{¶ 47} Father's first assignment of error is overruled.

### III. Second, Third, and Fourth Assignments of Error

{¶ 48} In his second assignment of error, Father contends that the trial court erred in finding that he did not have more than de minimis contact with A.J.W. between December 11, 2019, and December 11, 2020. In his third assignment of error, Father claims the trial court erred in determining that Father failed to have more than de minimis contact with A.J.W. during the applicable time frame without justifiable cause. In his fourth assignment of error, Father argues that the trial court erred in determining that Father failed to provide for the maintenance and support of A.J.W. during the applicable time frame without justifiable cause. Because each of these assignments of error relate to the trial court's ultimate decision that Father's consent was not required, we will consider them together.

{¶ 49} "[N]atural parents have a fundamental right to the care and custody of their children." (Citations omitted.) *In re Adoption of Pushcar*, 2006-Ohio-4572, ¶ 11. "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). "Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *Id.*,

quoting *In re Smith* at 16. To that end, " 'a petition to adopt a minor may be granted only if written consent to the adoption has been executed' by the persons whose consent is required under the adoption statutes." *In re Adoption of H.P.*, 2022-Ohio-4369, ¶ 20, quoting R.C. 3107.06. Both the mother and father of a child are presumed to have the right to withhold consent to an adoption. R.C. 3107.06. "A party may overcome this presumption by establishing that an exception under R.C. 3107.07 to the consent requirement applies." *Id.* at ¶ 20.

{¶ 50} Pursuant to R.C. 3107.07(A), a parent's consent to an adoption is not required when it is alleged in the adoption petition and the court finds by clear and convincing evidence that the parent has failed, without justifiable cause, to provide more than de minimis contact with the child or to provide maintenance and support for the child as required by law or judicial decree for a period of at least one year immediately preceding the filing of the petition for adoption or the placement of the child in the home of the petitioner. "The statute is written in the disjunctive; thus, the failure without justifiable cause to provide either more than de minimis contact or maintenance and support for the one-year time period is sufficient to obviate the need for a parent's consent." *In re L.R.O.*, 2020-Ohio-3200, ¶ 7 (2d Dist.), citing *In re Crandall*, 2007-Ohio-855, ¶ 10 (1st Dist.).

{¶ 51} Because adoption terminates a biological parent's fundamental right to the care and custody of his or her child, "we must construe strictly any exception to the requirement of parental consent to adoption in order to protect the right of natural parents to raise and nurture their children." *In re Adoption of P.L.H.*, 2017-Ohio-5824, ¶ 23, citing

*In re Adoption of Schoeppner*, 46 Ohio St.2d 21, 24 (1976).    Thus, "a party filing a petition for adoption who relies upon R.C. 3107.07(A) bears the burden of establishing by clear and convincing evidence that the exception to the consent requirement contained therein has been satisfied."    *In re Adoption of Sunderhaus*, 63 Ohio St.3d 127, 132 (1992).  "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."    *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.    Once the petitioner has established one of the exceptions to the consent requirement, "the burden of going forward shifts to the parent to show some facially justifiable cause for the failure."    *In re A.N.B.*, 2012-Ohio-3880, ¶ 10 (12th Dist.), citing *In re Adoption of Bovett*, 33 Ohio St.3d 102, 104 (1987).    "The burden of proof, however, remains with the petitioner."    *Id.*, citing *In re Adoption of Bovett* at 104.

### a.  More Than De Minimis Prong

{¶ 52} In examining whether the biological parent has failed to engage in more than de minimis contact under R.C. 3107.07(A), the probate court applies a two-step analysis.    *In re Adoption of L.K.P.*, 2024-Ohio-2551, ¶ 9 (2d Dist.).    First, the probate court must determine whether the parent has failed to provide more than de minimis contact with the child.    *In re Adoption of M.M.R.*, 2017-Ohio-7222, ¶ 7 (2d Dist.).    The first step involves deciding a factual question – in this case, whether Father failed to provide more than de minimis contact with A.J.W. for a period of at least one year

immediately preceding the filing of the adoption petition. *Id.* "A trial court has discretion to make these determinations, and in connection with the first step of the analysis, an appellate court applies an abuse-of-discretion standard when reviewing a probate court decision . . ." *In re Adoption of M.B.*, 2012-Ohio-236, ¶ 25.

{¶ 53} If the probate court found that the parent failed to have more than de minimis contact with the child during the applicable time period, "the court's second step is to determine whether justifiable cause for the failure has been proven by clear and convincing evidence." *In re Adoption of M.M.R.* at ¶ 8, citing *In re Adoption of J.R.H.*, 2013-Ohio-3385, ¶ 27 (2d Dist.). The question of whether justifiable cause for failure to have more than de minimis contact with the child has been proven by clear and convincing evidence in a particular case is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. *In re Adoption of Masa*, 23 Ohio St.3d 163 (1986), paragraph two of the syllabus.

{¶ 54} We conclude that the trial court did not abuse its discretion in finding that Father failed to provide more than de minimis contact with A.J.W. during the one year immediately preceding the adoption petition. De minimis contact certainly includes any physical visitation with a child, but can also include other forms of contact and support, such as "gifts, cards, letters, financial support and telephone calls . . ." *In re Petition for Adoption of A.M.D.*, 2016-Ohio-6976, ¶ 17 (7th Dist.). According to Grandparents, Father did not call them to contact A.J.W., stop by their home to see A.J.W., send mail or gifts to A.J.W., or have any other contact with A.J.W. between December 11, 2019, and

December 11, 2020. Father admittedly did not have any in-person contact with A.J.W. during the relevant time frame, nor did he attempt to have in-person contact with him. Father also admitted to not sending A.J.W. anything in the mail or leaving anything at Grandparents' home for him. Father claimed to have attempted three phone calls to Grandparents and to have successfully had one video call with A.J.W. during the relevant time, in which he spoke with A.J.W. for approximately 4-5 minutes. However, the probate court found Grandparents credible and did not find Father credible. We defer to the credibility determinations of the probate court, which was "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). Based on this evidence, we cannot conclude that the trial court abused its discretion in finding that Father failed to have more than de minimis contact with A.J.W. for at least one year prior to the filing of the adoption petition.

{¶ 55} Father argues on appeal that his single video phone call with A.J.W., which occurred sometime in April 2020, constituted more than de minimis contact to require his consent to adopt. We do not agree. "Though not defined by statute, 'more than de minimis contact' implies contact – either attempted or successful – beyond a single occurrence." *In re Adoption of L.K.P.*, 2024-Ohio-2551, at ¶ 10 (2d Dist.), citing *In re Adoption of T.U.*, 2020-Ohio-841, ¶ 25 (6th Dist.). Thus, even if the trial court believed Father's testimony regarding the single phone call, it would not have constituted more than de minimis contact during the applicable time frame.

{¶ 56} In his second assignment of error, Father further argues that even if he failed to engage in more than de minimis contact during the applicable time frame, there was justifiable cause for his failure. The term "justifiable cause" is not defined by statute, and the Ohio Supreme Court has refused to adopt a "precise and inflexible meaning" for the term. *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367 (1985). Instead, the Court has stated that "the better-reasoned approach would be to leave to the probate court as finder of fact the question of whether or not justifiable cause exists." *Id.,* citing *In re Adoption of McDermitt*, 63 Ohio St.2d 301 (1980). The term "justifiable" is defined as "[l]egally or morally acceptable for one or more good reasons; excusable; defensible." *Black's Law Dictionary* (12th ed. 2024).

{¶ 57} "[A]n important consideration regarding justifiable cause is the parent's willingness and ability to support or contact a child." *In re Adoption of R.A.H.*, 2021-Ohio-1667, ¶ 14 (2d Dist.), citing *In re Adoption of Masa*, 23 Ohio St.3d at 166. Furthermore, a parent's "efforts to enforce his parental rights, prior to the filing of [a petitioner's] adoption petition" is a relevant consideration when evaluating justifiable cause. *Adoption of M.G.B.-E.*, 2018-Ohio-1787, ¶ 43. "[S]ignificant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child." *In re Adoption of Holcomb* at 367-68.

{¶ 58} "We review the probate court's decision under a manifest weight standard which requires us to weigh the evidence and all reasonable inferences, consider the

credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the probate court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Adoption of R.A.H.* at ¶ 15, citing *In re Adoption of J.L.*, 2019-Ohio-366, ¶ 25 (1st Dist.). "Importantly, we must be mindful that the probate court, as the trier of fact, is in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony." *Id.*, citing *In re Adoption of J.L.* at ¶ 25.

{¶ 59} In the case before us, the trial court's decision finding that Father lacked justifiable cause for failing to provide more than de minimis contact with A.J.W. during the one year immediately preceding the filing of the adoption petition was not against the manifest weight of the evidence. Father argues that he was unable to have more than de minimis contact with A.J.W. because he was incarcerated. But, generally, incarceration of a parent does not justify the failure to have more than de minimis contact with a child, because it does not preclude other forms of contact, such as letter-writing or phone calls. *In re Adoption of R.M.Z.*, 2009-Ohio-5627, ¶ 21 (2d Dist.). In this case, Father claims he attempted to call Grandparents from jail or prison on three separate occasions, but Grandparents hung up on him. Father also stated that he did not know Grandparents' mailing address in order to send A.J.W. anything.

{¶ 60} The probate court rejected Father's excuse of incarceration as justifiable cause for his failure to have more than de minimis contact with A.J.W. The court credited the testimony of Grandparents that Father never called them from jail or prison or while Father was not in custody. Additionally, although Father claimed he did not know

Grandparents' mailing address, he could easily have discovered it; they had lived in the same home since 2017, and Father explained that he had relatives who were related to Grandparents. According to Father, while he was out of custody in April 2020, he had a video phone call with his cousin while she was at Grandparents' house. Father could have asked his cousin for the address at that time, or any other time, but did not. Moreover, Father was not in custody between March 24, 2020, and June 1, 2020, but made no effort to learn of the address, to contact Grandparents, or to make any attempts at visitation with A.J.W., "as one might reasonably expect him to do if he sought to form or sustain a relationship with the child." *In re Adoption of S.M.H.*, 2014-Ohio-45, ¶ 15 (2d Dist.). Notably, Father did not file a motion for a change of custody or to get parenting time until March 7, 2022, more than two years *after* the adoption petition was filed.

{¶ 61} Father maintained that he did not contact A.J.W. while he was out of custody because, at some unknown time prior to the one-year relevant time frame in this case, Grandfather had allegedly threatened to call the police on him if he showed up at their home and had threatened him with guns. Grandfather testified that he did not own any guns, he did not threaten Father, and he would have allowed visitations if they were supervised for the safety of A.J.W. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." (Citations omitted.) *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). Here, the probate court credited the testimony of Grandparents over Father in finding that Father's failure to have more than de minimis contact with A.J.W. was without justifiable cause. The record does not reflect that this is

a case in which a parent's attempts to contact a child were intentionally thwarted or refused by the child's custodians to substantiate justifiable cause.

{¶ 62} After carefully reviewing the entire record and considering the totality of the circumstances, we conclude that the record supports the trial court's conclusion that Father failed to have more than de minimis contact with A.J.W. during the one year immediately preceding the filing of the adoption petition without justifiable cause. The probate court did not clearly lose its way or create a manifest miscarriage of justice. Because this is not one of those exceptional cases in which the evidence weighs heavily against the probate court's decision, Father's third assignment of error is overruled.

### b. Maintenance and Support Prong

{¶ 63} In his fourth assignment of error, Father challenges the probate court's finding that he failed to provide support for A.J.W. without justifiable cause in the one year preceding the filing of the adoption petition. However, "[t]he statutory language at issue does not require a petitioner to demonstrate both . . . failure to support the child and to communicate with the child; the statute is to be read in the disjunctive." *In re Adoption of Z.A.*, 2016-Ohio-3159, ¶ 33 (5th Dist.), citing *In re Adoption of McDermitt*, 63 Ohio St.2d at 304. Therefore, in light of our resolution of Father's second and third assignments of error, we find this assignment of error to be moot.

{¶ 64} Father's fourth assignment of error is overruled.

### IV. Fifth Assignment of Error

{¶ 65} Finally, in his fifth assignment of error, Father claims that his trial counsel provided ineffective assistance that resulted in reversable harm. Specifically, Father

contends that his trial counsel was unprepared on the day of the hearing and did not present any documentary evidence, did not object to Grandparents' exhibits, and did not call any witnesses beyond his own client to testify.

{¶ 66} As a preliminary matter, although there has been some question as to whether an ineffective assistance of counsel claim applies to private adoption proceedings in probate court, we now conclude that it does apply. Recently, the Ohio Supreme Court held that "[i]ndigent parents are entitled to counsel in adoption proceedings in probate court as a matter of equal protection of the law under the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution." *In re Adoption of Y.E.F.*, 2020-Ohio-6785, syllabus. Where a parent has a constitutional right to counsel, that includes the right to the effective assistance of counsel. *In re S.A.*, 2008-Ohio-2225, ¶ 8 (2d Dist.), citing *In re Wingo*, 143 Ohio App.3d 652, 666 (4th Dist.). "[W]hen the proceeding contemplates the loss of parents' essential and basic civil rights to raise their children, the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody." *In re P.M.*, 2008-Ohio-6041, ¶ 15 (2d Dist.), citing *In re Heston*, 129 Ohio App.3d 825, 827 (1st Dist. 1998).

{¶ 67} To succeed on an ineffective assistance of counsel claim, an appellant must establish: (1) trial counsel's deficient performance; and (2) that the deficient performance caused prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. "The failure to make a showing

of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel." *State v. Blanton*, 2023-Ohio-89, ¶ 56 (2d Dist.), citing *Strickland* at 697.

{¶ 68} To show deficiency, the appellant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland* at 688. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland.* "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook*, 65 Ohio St.3d 516, 524-525 (1992), citing *Strickland* at 687-689.

{¶ 69} To establish prejudice, the appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

{¶ 70} "[I]n Ohio, a properly licensed attorney is presumed competent." (Citations omitted.) *State v. Gondor*, 2006-Ohio-6679, ¶ 62. Therefore, the burden of showing ineffective assistance of counsel is on the party asserting it. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985).

{¶ 71} Father's argument that his attorney's inability to prepare for the hearing fell below an objective standard of reasonable representation under the first prong of *Strickland* lacks merit. Counsel's inability to prepare was caused solely by Father's voluntary action, i.e., hiring counsel two hours prior to the hearing. Father acknowledges this in his brief, stating that "[f]irst and foremost, trial counsel is not to blame for his ineffective assistance."

{¶ 72} The record reflects that counsel did everything he could to advocate for Father at the hearing. He requested a continuance, he cross-examined witnesses, and he presented Father's testimony. Father fails to identify what other evidence or witnesses could have been produced at the hearing but were not as a result of counsel's actions. Rather, Father's dilatory actions hampered counsel's ability to introduce any evidence or even to request time to obtain additional evidence because the discovery deadline had long passed. Moreover, prior to counsel's hiring, Grandparents' request for admissions had been deemed admitted as a result of Father's failure to respond, which further limited counsel.

{¶ 73} Father additionally argues that counsel was ineffective for failing to object to two documents Grandparents submitted as exhibits. The first document was a March 4, 2020, "Magistrate's Decision and Judge's Order" filed in the juvenile division of the Montgomery County Court of Common Pleas, which granted legal custody of A.J.W. to Grandparents. The second document was Grandparents' request for admissions in this probate case. Father has not suggested why either of those documents should have been objected to by counsel, and we see no reasonable likelihood that the probate court

would have sustained an objection had it been made. Thus, the outcome of the case would not have changed had counsel objected to their admission.

{¶ 74} Under these circumstances, we cannot conclude that counsel rendered ineffective assistance. Father's fifth assignment of error is overruled.

## V.    Conclusion

{¶ 75} Having overruled all of Father's assignments of error, we will affirm the judgment of the probate court.

. . . . . . . . . . . . .


WELBAUM, J. and TUCKER, J., concur.